**Reversed and Rendered in Part and Affirmed in Part and Majority and Concurring Opinions filed April 12, 2022.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-21-00590-CV

---

### IN THE INTEREST OF L.E.R., A CHILD

---

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2018-03438J**

---

### MAJORITY OPINION

Appellant J.M.C. ("Mother") appeals the trial court's final order of termination of her parental rights to her child L.E.R. ("Lori").[1] The trial court terminated Mother's parental rights on the predicate grounds of endangerment, constructive abandonment, and failure to comply with the service plan for reunification. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (N), and (O). The trial court also determined that termination of Mother's parental rights was in Lori's best interest. *See id.* § 161.001(b)(2). In four issues, Mother challenges the

---

[1] We use pseudonyms or initials to refer to the child, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

legal and factual sufficiency of the evidence to support the trial court's findings on the predicate grounds and the best interest finding. We reverse and render in part and affirm in part.

## BACKGROUND

This case began because the Department of Family and Protective Services (the "Department") received a referral on June 15, 2018, alleging that during Lori's delivery Mother was aggressive and erratic and assaulted nurses. The referral alleged that Mother had "pressured speech," "demonstrated poor impulse control, and delayed responses."[2] It alleged that Mother neither held Lori nor bonded with her since birth; and Mother's primary care physician expressed concern about Mother "taking on the responsibility of caring for an infant child without first receiving a psychological evaluation as soon as she delivered the child."

Because Mother was uncooperative during the investigation, "refused to participate in ongoing CPS services," and there was concern for Lori's safety, the Department filed an Original Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship on June 21, 2018. The Department sought temporary managing conservatorship of Lori; it also sought conservatorship and/or parental termination if reunification with Lori's parents was not suitable. The trial court granted the Department managing conservatorship of Lori. On July 7, 2018, Lori was placed with a foster parent, Mary.

After a full adversary hearing on July 12, 2018, the trial court appointed the Department temporary managing conservator of Lori and found, among other things, that (1) removal was in Lori's best interest; (2) there is a "continuing

---

[2] While many of the facts giving rise to this case appear to be conclusory, we are limited to examining the arguments and objections made by Appellant at the trial court and on appeal.

danger to the physical health or safety of the child and for the child to remain in the home is contrary to the welfare of the child;" (3) "reasonable efforts consistent with the child's health and safety have been made by the Department to prevent or eliminate the need for removal of the child;" and (4) "appointment of the parent or parents as managing conservator of the child is not in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development."

The Department filed a Family Service Plan on August 3, 2018, providing the following service plan goals: Mother will (1) "show the ability to parent and protect her daughter;" (2) "actively participate in therapy to understand how her health can impact her current parenting style;" and (3) "demonstrate ability to protect the child from harm." The plan also set forth a list of tasks and services Mother needed to complete:

- Participate in and complete individual therapy, and complete any recommended family or group therapy;

- Cooperate with all tasks required by the agency;

- Comply with all visitation guidelines as arranged by the caseworker;

- Attend all court hearings, permanency conferences, and scheduled family visits;

- Complete parenting classes;

- Maintain stable employment or income benefits for six months;

- Acquire and maintain stable housing for more than six months; housing must be safe, clean, free of hazards, and it must have operating utilities;

- Participate in and complete a psycho-social assessment and follow all

3

recommendations which may include a psychiatric evaluation, individual therapy, family therapy, and/or group therapy; and

- Participate in a psychological evaluation and follow all recommendations from the service provider.

After a status hearing on August 7, 2018, the trial court signed an order finding, among other things, that (1) Mother had appeared in person and through her attorney at the hearing; (2) Mother's service plan is reasonable; (3) the goal of the service plan is to return Lori to Mother, and the plan adequately ensures that reasonable efforts are being made to enable Mother to provide a safe environment for Lori; (4) the plan is reasonably tailored to address any specific issues identified by the Department; (5) Mother reviewed and understood the service plan, Mother has been advised that unless she is willing and able to provide Lori with "a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or to termination or [Lori] may not be returned to her;" and (6) Mother signed the plan. The trial court approved the service plan and made it an order of the court.

The Department filed a second service plan on September 10, 2018, expressing concerns that Mother had not started any of the requested services in the first plan. The second plan is identical to the first service plan except that it added to the list of tasks and services that Mother was required to complete a psychiatric evaluation and to "follow all recommendations which may include a medicine regiment, individual therapy, family therapy, and/or group therapy."

On June 13, 2019, Father executed an affidavit voluntarily relinquishing his parental rights to Lori. On October 14, 2019, Mary (the foster parent) filed a Petition in Intervention in Suit Affecting the Parent-Child Relationship, requesting

4

that the court (1) name her as Lori's sole or joint managing conservator; (2) grant her an order of adoption of Lori; and (3) terminate Mother's and Father's parental rights to Lori. Based on Father's relinquishment of parental rights, the trial court signed an order terminating Father's parental rights to Lori on January 26, 2021. In its August 25, 2021 permanency report to the court, the Department recommended to the court that it be dismissed as temporary managing conservator of Lori and that the foster parent adopt Lori. On September 10, 2021, a bench trial was held to terminate Mother's parental rights.

Five witnesses testified at trial: the Department's investigation caseworker Inger Smith (nee Barnaby), the Department's conservatorship caseworker Lana Ford, Child Advocates, Inc. representative Brittany Swain, Lori's foster mother Mary, and Lori's adult half-sister Alexis. Even Father came to trial and was ready to testify. Mother did not appear at trial, even though she was given the option to appear in person or via Zoom. Before any testimony, the trial court admitted into evidence, among other things, copies of the second family service plan, Mother's drug screening results, Smith's affidavit, the Child Advocates report, permanency reports, Mother's psychological evaluation, and Mother's psychiatric evaluation. We begin with a recitation of the testimony and evidence.

### *Caseworker Smith*

Smith testified that she "received an intake" on June 15, 2018, for neglectful supervision of Lori, who was still in the hospital at the time. The referral included allegations that Mother was "aggressive during delivery," Father "denied that the child was his and also the mother's behavior was described as being just erratic and that she was . . . possibly using illicit drugs." Smith testified that during her investigation the "nursing staff said that [Mother] actually was kicking and assaulted the nurses during delivery." The nurses were concerned about how

5

Mother "treated the baby" after she was born because Mother "actually said she wanted — once the baby was placed on her stomach during delivery, which is a normal practice, she stated to get the baby off her immediately." And after Lori's birth, Mother did not bond with her.

Further, Smith's investigation (which she also memorialized in an affidavit) confirmed that Mother was very aggressive. "There was a situation where during delivery she was kicking so much that her IV came apart; and when the IV came apart, blood was gushing everywhere." The hospital staff told Smith that "it was abnormal behavior for a person. They had never seen something like that." However, Mother denied "behaving erratically during the delivery of [Lori] by physically assaulting the nurses." Mother told Smith that the nursing staff did not administer pain medication promptly and that the medication was not administered until after the baby's head was exposed during delivery. Mother claimed "she was only reacting to the pain." Mother told Smith that when the nurse placed Lori on Mother's chest, Mother was afraid of dropping Lori because "she felt numb, so she demanded the child be removed immediately."

Smith testified that she observed interactions between Mother and Father in the hospital room. Smith described it as "kind of an abusive situation. [Mother] was speaking to [Father] verbally in a way that, you know, you shouldn't speak to a person. They weren't getting along very well." Smith's investigation revealed that because of Mother's behavior, an "MAT" evaluation was ordered after she delivered Lori.[3] According to the evaluation, Mother "demonstrated delays in responses, poor focus, poor impulse control, delay in processing information, and poor attention." Smith testified that she spoke to Mother's nurse practitioner, who

---

[3] Nothing in the record explains what an "MAT evaluation" is, why it was ordered, under what authority it was ordered, or by whom it was performed.

6

"stated that before the child would ever be taken home, [she] recommended that a psychiatric evaluation be done on" Mother.

After she spoke at the hospital with medical personnel, Mother, and Father, Smith visited the home in which Mother and Father lived. Smith testified that "the home was not prepared to receive a child. The floor was missing. The air-conditioning was not working. It was during the summertime so it was extremely warm in the home."

On June 18, 2018, while Lori was still in the hospital, Smith contacted Mother's primary care physician to inquire whether he had any concerns regarding Mother's ability to care for Lori. Mother's physician recommended that she should "be cleared by a psychiatrist, and receive a full psychiatric evaluation before being allowed to care for" Lori. Smith testified that she contacted Mother that same day to ask if Mother had a recommendation regarding Lori's placement because the Department would not return Lori to her or Father. Mother recommended her brother, Steven, and sister-in-law, Susan. The Department approved placement with Steven and Susan after conducting a background check for any criminal history and CPS (Child Protective Services) history. When Smith went to Mother's and Father's home on June 19, 2018, to have a meeting and review the paperwork, only Father was present. Smith contacted Mother but Mother refused to come home for the meeting and stated that "she did not know what she was going to do with" Lori, she did not want Steven and Susan to be Lori's caregivers, and she was thinking about giving Lori up for adoption.

The next day, Smith again contacted Mother about a relative placement for Lori but Mother yelled, screamed, and stated she needed more time. Mother stated that she needed a couple of weeks before she could make a decision and she would not sign anything that would allow Lori to be placed with relatives despite

knowing the hospital intended to discharge Lori. Lori was placed with Steven and Susan but was shortly thereafter removed following an anonymous call from a relative. The relative was at a family function with Steven and Susan, and Susan was intoxicated, and apparently told a story to the crowd that earlier that morning Lori was sleeping on Steven "and during the time the baby fell on the floor," but Steven did not wake up to notice that Lori was on the floor. Susan woke up and picked up Lori. While talking about the incident, Susan "was laughing and thought it was very funny that no one woke up to see that the child was on the floor." Smith testified that the anonymous caller also told her that Steven and Susan kept Lori "in an infant bathing suit in the sweltering heat, w[ere] pulling her up by her arms and w[ere] just not appropriate with the care with the child."

As a result of the call, Smith spoke to Mother and testified that Mother admitted knowing that Steven and Susan had a CPS history (but gave no further details about Mother's knowledge about the extent of Steven's and Susan's history with CPS, and further testified that the Department did not previously find their CPS history because the earlier case was filed under Susan's maiden name, and that the allegations behind the charges were unable to be determined). Smith removed Lori from Steven's and Susan's home on July 6, 2018, and placed Lori the next day in foster mother Mary's care. Lori lived with Mary since her removal and was still in her care at trial.

Smith testified that she investigated other possible family placements. Father had a 19-year-old son who had similar health issues as Father; and the only other person Mother recommended for Lori's placement did not pass CPS background checks. Smith testified that during the time she was assigned to the case, Mother was not cooperative and Smith never found the parents' home to be safe or stable. Although Smith could not recall if Mother had prior CPS history,

Smith testified that Mother had APS (Adult Protective Services) history for allegedly attacking Father.

### *Caseworker Ford*

Ford, who was the caseworker assigned to the case after Lori was placed with Mary, testified at trial and requested on behalf of the Department that the trial court terminate Mother's parental rights on grounds of endangerment, constructive abandonment, and failure to comply with the service plan for reunification and in the best interest of Lori. Ford explained why she believed that Mother had endangered Lori. Ford testified that Mother has a tendency to be violent and Ford is concerned about the safety in the home. Ford received several reports of domestic violence in the home and there have been "a lot of calls to law enforcement to [the] home" as recently as August 24, 2021.[4] According to Ford, Father has told her that Mother is violent. Every month, Father expressed concern in conversations with Ford about Mother's state of mind, his safety, and the safety of Lori because he did not think Mother could care for Lori. Father has repeatedly tried to get Mother to leave his home and even called APS to "get some relief from her abusive behavior," but Mother refused to leave.

Ford testified that she had discussions with Mother about "her violent nature" but Mother was unreceptive to Ford's efforts to try to find a solution. Every time Ford offered Mother another place to live, she refused. For example, Ford offered Mother a place in a shelter at which she would "work programs" and then "have her own place," but Mother refused. Ford testified that it is very hard for her to work with Mother because, if Mother does not get or hear what she wants, "she's very aggressive with [Ford] and then at that time, she'll stop talking to [Ford]." Mother only called Ford when she was upset with Father. Mother

---

[4] The trial date below was September 10, 2021.

would claim that Father was harming her and that she was afraid for her life, but when Ford asked Mother to move out so she can be in a safe environment, Mother did not want to leave.

Ford believed that an unsafe home endangered Lori. Ford was also concerned about Mother's lack of visitation with Lori and Mother's behavior during the visits she actually joined. Mother would get upset with Lori during face-to-face visits and would just walk away, leave, and not attend to Lori's needs. Ford testified that Mother was "involved with [Lori] only when she fe[lt] that [Lori] is attentive to her;" otherwise, Mother would leave.

Ford testified that Mother never stated she wanted to see Lori. It was Father who always "made sure and scheduled all" the visits with Lori "and Mother would show up and then when [Father] relinquished, [Ford] would contact [Mother] directly", but Mother would say she needed to talk to Father "to see when was a good time and then afterwards she just stopped responding to" Ford. Ford testified that she had Zoom meetings with Mother from March 2020 to August 2020, when Mother "stopped participating." Ford stated that Mother's last visit was on August 27, 2020, but Mother did not show her face or respond. Thereafter, Ford called Mother every month to try to schedule a visit, but Mother never called back or ever showed any interest in seeing Lori. Ford further testified that Mother never made a child support payment to Mary; Mother only gave a stuffed animal to Lori and two outfits that were too small.

Ford expressed concern that Mother failed to comply with the tasks, services, and goals set forth in the service plan Ford drafted for Mother. Ford testified that Mother signed and received a copy of the service plan. Mother completed a psychological evaluation, a psychiatric evaluation, parenting classes, and individual therapy; she also showed Ford a disability reward letter to prove

10

stable income. However, Mother neither completed additional therapy in June 2020 nor family therapy as required by her service plan. Ford testified that Mother and Father "could not even start that service because of the arguing within the home." Ford stated that she told Mother at a permanency hearing that Mother should complete additional therapy. Mother was required to provide stable housing but failed to do so. Ford testified that, in addition to not completing the required tasks, Mother did not achieve the goals of the service plan and (in her opinion) could not "provide for the ongoing safety and well-being of" Lori.

Ford testified that she discussed every item on the service plan with Mother. She could not "put a number on" how many times she discussed the plan with Mother, but stated that every time she spoke to Mother, she would "definitely go over the plan" with her. Ford stated that she spoke to Mother at least twice a month. Ford also offered to meet with Mother every month. Mother last responded to Ford's request to meet in August 2021, stating she had a stomach bug and that she was "a little upset because a good friend of mine has cancer and she passed away." Ford claimed that Mother's statements sounded like an excuse to not meet with Ford.

Ford expressed concern that Mother was not taking her Xanax prescription regularly, causing her to become "quite agitated," anxious, and very aggressive. Ford testified that Mother told her Mother had been diagnosed with Huntington's disease; Huntington's disease[5] does not have a cure and is progressive in nature.

---

[5] "Huntington's disease is a rare, inherited disease that causes the progressive breakdown (degeneration) of nerve cells in the brain. Huntington's disease has a broad impact on a person's functional abilities and usually results in movement, thinking (cognitive) and psychiatric disorders." https://www.mayoclinic.org/diseases-conditions/huntingtons-disease/symptoms-causes/syc-20356117. "No treatments can alter the course of Huntington's disease. But medications can lessen some symptoms of movement and psychiatric disorders. And multiple interventions can help a person adapt to changes in his or her abilities for a certain amount of time." https://www.mayoclinic.org/diseases-conditions/huntingtons-disease/diagnosis-

Mother was also diagnosed with adjustment disorder with anxiety.

With regard to Lori's life since her placement with Mary, Ford testified that Lori was "really flourishing." Ford stated Lori is in pre-kindergarten, she is active and friendly, she is learning how to swim and speak Spanish, she has "a very good routine," and she is "very much" bonded with Mary and Mary's family. Lori also visits with her half-sister and half-brother—Mother raised neither of her two other children, and Lori's half-siblings and Mother's family desire for Lori to remain with Mary. Ford testified that Lori would not maintain a relationship with her half-siblings if she were to be returned to Mother because Mother does not have a relationship with her children and her family. Ford also stated that Mary has a stable job and provides for Lori's emotional needs. Ford confirmed that it is also Father's desire for Lori to remain with Mary.

### Child Advocates Representative Swain

Swain testified that Child Advocates has been involved in Lori's case since August 2018, and she is the child advocate for Lori. Swain stated that termination of Mother's parental rights would be in Lori's best interest because: Lori is in a safe and stable environment; Lori's placement with Mary "has been meeting all of her needs, not just basic, [but] exceeding her needs"; Lori is extremely happy and her life is structured; there is no domestic violence in Mary's home; Mary's home is well kept; Lori is "just very happy and she's thriving;" Lori recognizes Mary as her family; Lori has made "healthy developmental progress" in Mary's care; and there is a bond between Lori and Mary. Swain testified that she has no reservations about Mary and her family. According to Swain, Mary plans to adopt Lori which is in Lori's best interest.

---

treatment/drc-20356122.

### Foster Mother Mary

Mary testified that Lori has lived with her for most of Lori's life and that she plans to adopt Lori if the court terminates Mother's parental rights. Mary stated that she developed relationships with Lori's biological family, in particular with Lori's half-siblings, Alexis and Stan, and Lori's step-grandmother (Mother's stepmother who helped raise Mother). Mary testified that Mother has not had any visitation with Lori in well over a year and asked the court to terminate Mother's parental rights.

### Half-sister Alexis

Finally, Alexis testified at trial that it would be in Lori's best interest to terminate Mother's parental rights because Mother "is abusive and neglectful so — which is not a good environment for children and I've seen [Mary] with L[ori] and she is a good environment." Alexis explained that she had been raised by her grandparents, although Mother "was technically there." According to Alexis, Mother "just didn't seem very interested unless, you know, it was — she was trying to make a statement somehow." It was her grandparents who provided Alexis emotional and financial support. Alexis did not believe that Lori would be safe if she were to be returned to Mother. Based on past experience with Mary, Alexis believed that she would have a positive relationship with Lori if the court terminates Mother's parental rights. Alexis was doubtful that she would continue to have a positive relationship with Lori if Lori were to live with Mother. Alexis also mentioned that Mother wanted to move in with Alexis so Alexis could take care of both Mother and Lori, but Alexis made clear she did not "want to do that" because she "lived with [Mother] enough."

On September 28, 2021, the trial court signed a Final Decree for Termination, finding by clear and convincing evidence that termination of

Mother's parental rights was in Lori's best interest and warranted under three subsections of section 161.001(b)(1) of the Family Code: (D) (endangerment by environment), (N) (constructive abandonment), and (O) (failure to comply with court-ordered plan for reunification with the child). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (N), and (O). The trial court appointed the Department as Lori's sole managing conservator. Mother filed a timely appeal.

## ANALYSIS

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother raises four issues on appeal, challenging the legal and factual sufficiency of the evidence supporting the trial court's (1) findings under sections 161.001(b)(1)(D), (N), and (O); and (2) best interest finding.

## I. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, a child's emotional and physical interests should not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the

truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

This heightened burden of proof results in heightened standards of review for evidentiary sufficiency. *In re V.A.*, 598 S.W.3d 317, 327 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). For a legal sufficiency challenge, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all controverting evidence a reasonable factfinder could disbelieve. *Id.*

For a factual sufficiency challenge, we consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re C.H.*, 89 S.W.3d at 25. We examine whether disputed evidence is such that a reasonable factfinder could not have resolved that dispute in favor of its finding. *Id.*

The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not credible.'" *In re V.A.*, 598 S.W.3d at 328 (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003)).

## II.  Predicate Findings

The trial court made predicate termination findings pursuant to Texas Family Code section 161.001(b)(1)(D), (N), and (O). In her first, second, and third issues, Mother challenges the legal and factual sufficiency of the evidence to

support the trial court's findings on these predicate grounds.

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re V.A.*, 598 S.W.3d at 327. Due process requires that when a parent has raised the issue of insufficiency of the evidence to support the trial court's findings under section 161.001(b)(1)(D) or (E) of the Family Code, an appellate court must address one of those endangerment findings to ensure a meaningful appeal. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); *In re P.W.*, 579 S.W.3d 713, 720 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Due process and due-course-of-law requirements also mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code. *In re P.W.*, 579 S.W.3d at 720. In this case, Mother challenges the trial court's finding of endangerment; we, therefore, address the trial court's endangerment finding under section 161.001(b)(1)(D).

## A.   Predicate Finding under Section 161.001(b)(1)(D)

In her first issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding of endangerment under subsection D.

Termination under subsection D requires clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re V.A.*, 598 S.W.3d at 328. Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family

16

environment," but it is not necessary that the conduct was directed at the child or that the child actually suffered injury. *In re M.C.*, 917 S.W.2d at 269.

Endangerment under subsection D focuses on evidence related to the child's environment, *i.e.*, the acceptability of living conditions as well as the parent's conduct in the home. *In re C.W.M.P.*, No. 14-20-00571-CV, 2021 WL 244865, at *5 (Tex. App.—Houston [14th Dist.] Jan. 26, 2021, pet. denied) (mem. op.); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A child is endangered when the environment creates a potential for danger and the parent is aware of the danger yet consciously disregards it. *In re V.A.*, 598 S.W.3d at 328. Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical or emotional well-being of a child as required for termination under subsection D. *In re C.W.M.P.*, 2021 WL 244865, at *5; *In re S.R.*, 452 S.W.3d at 360.

Parental rights may be terminated under subsection D based on a single act or omission. *In re C.W.M.P.*, 2021 WL 244865, at *5; *In re V.A.*, 598 S.W.3d at 329. In evaluating endangerment under subsection D, the court has to consider the child's environment before the Department obtained custody. *In re C.W.M.P.*, 2021 WL 244865, at *6; *In re V.A.*, 598 S.W.3d at 329. Subsection D is not a basis for termination of parental rights if the parent was unaware of the endangering environment. *In re V.A.*, 598 S.W.3d at 329. There must be clear and convincing evidence of endangerment as well as of the parent's awareness of the endangering environment. *Id*.

Mother contends the judgment of the trial court terminating her parental rights under subsection D should be reversed because Lori was never in Mother's possession and was removed from Mother and Father at the time of birth while still in the hospital. Mother argues that the "relevant time frame in a subsection (D)

case to determine whether there is clear and convincing evidence of endangerment is before" a child's removal by the Department. Therefore, Mother argues, "[b]ecause Lori was never in Mother's custody, it stands to reason that she could not have been responsible for knowingly placing or knowingly allowing the child to remain in conditions or surroundings which endangered the child's physical or emotional health."

The Department counters that the trial court's finding that Mother's parental rights to Lori should be terminated under subsection D is supported by legally and factually sufficient evidence. In particular, the Department points to the following evidence in support of its contention: (1) Mother assaulted nurses during Lori's delivery and jumped in the hospital bed which caused her IV to be dislodged; (2) Mother did not bond with Lori; (3) Father denied paternity and stated he would commit suicide if he lost his eye sight completely; (4) Mother did not eat a healthy diet during pregnancy and did not receive prenatal care; (5) Mother recommended placing Lori with relatives who had CPS history; (6) there was domestic violence in Mother's and Father's home; (7) the home was in disrepair, had a broken refrigerator and A/C and was thus unfit for a child; (8) Mother had abandoned her previous two children; (9) Mother had health issues like Huntington's disease; (10) family members reported Mother was abusive and manipulative and none of her "extended family recommended that she maintain her parental rights to Lori;" and (11) Mother did nothing to provide a safe environment for Lori as required by the service plan.

We agree with Mother that there is legally insufficient evidence to support the trial court's finding under subsection D. To begin with, Mother assaulting nurses, jumping on the bed, eating an unhealthy diet, not receiving prenatal care, and abandoning her two other children as well as Mother's failure to bond with

Lori and Father's denial of paternity or threat of suicide is not evidence of abusive or unlawful conduct that created a dangerous environment in which Lori lived or remained. Mother's recommendation to place Lori with relatives who had CPS history does not constitute evidence that Mother knowingly placed or knowingly allowed Lori to remain in a dangerous environment because Lori was in the Department's care. It is the Department's responsibility to conduct competent background checks and find any relevant CPS history to ensure appropriate placement of a child it removes from its natural parents. Additionally, there was no evidence that Steven and Susan actually had a CPS history, nor any evidence that it was substantiated. This type of inference-upon-inference does not rise to the level of clear and convincing evidence that can support a determination that a parent has engaged in the conduct described in Family Code section 161.001(b)(1)(D).

Further, domestic violence in Mother's and Father's home, Mother's health issues, the home being in disrepair, Mother being abusive and not providing a safe environment per her service plan, and her extended family not recommending she maintain her parental rights to Lori is not evidence in support of a finding under subsection D. Lori was never in Mother's home or care; Lori never lived with Mother. Therefore, Mother never placed or allowed Lori to remain in conditions or surroundings which endangered Lori's physical or emotional well-being as required by subsection D. We conclude the evidence is legally insufficient to support the trial court's finding that Mother engaged in the conduct described in Family Code section 161.001(b)(1)(D).

Accordingly, we sustain Mother's first issue on legal insufficiency and do not need to reach the question of factual insufficiency.

### B. Predicate Finding under Section 161.001(b)(1)(N)

In her second issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding of constructive abandonment under subsection N.

Termination under subsection N requires clear and convincing evidence that the parent has constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department for not less than six months, and (1) the department has made reasonable efforts to return the child to the parent; (2) the parent has not regularly visited or maintained significant contact with the child; and (3) the parent has demonstrated an inability to provide the child with a safe environment. Tex. Fam. Code Ann. § 161.001(b)(1)(N). The first element focuses on the Department's conduct; the second and third elements focus on the parent's conduct. *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

Mother does not challenge the sufficiency of the evidence to support the finding that (1) Lori was in the Department's care for more than six months; (2) Mother has not regularly visited or maintained significant contact with Lori; and (3) Mother has demonstrated an inability to provide Lori with a safe environment. Therefore, we will focus on Mother's argument that "the first element of the (N) ground was not met because it was not supported by the evidence in the record and was not proven by clear and convincing evidence." In that regard, Mother states: "Smith testified that she visited Mother's home and that it was not suitable for a child but no testimony was offered about the reasonable efforts to place the child in her home. Ford testified that she spoke to Mother about moving to another place but Mother was not receptive to moving. This testimony is at best[] weak and does not rise to the level of clear and convincing."

Under the first element, returning a child to a parent under section

20

161.001(b)(1)(N)(i) does not necessarily mean that the child must be physically delivered to the parent. *In re A.M.T.*, No. 14-18-01084-CV, 2019 WL 2097541, at *4 (Tex. App.—Houston [14th Dist.] May 14, 2019, pet. denied) (mem. op.). Implementation of a family service plan by the Department is considered a reasonable effort to return a child to its parent. *Id.*; *In re A.L.H.*, 468 S.W.3d at 744; *In re K.G.*, 350 S.W.3d 338, 354 (Tex. App.—Fort Worth 2011, pet. denied). A family service plan is designed to reunify a parent with a child who has been removed by the Department. *In re A.M.T.*, 2019 WL 2097541, at *4. A service plan must, among other things, (1) be specific; (2) state the goal of the plan, which may be the return of the child to the child's parents; and (3) state the actions and responsibilities necessary for the child's parents to take to achieve the plan goal. *Id.*; *see also* Tex. Fam. Code Ann. § 263.102.

In this case, Ford created a service plan for Mother which required Mother to (1) complete individual therapy and any recommended family or group therapy; (2) cooperate with all tasks required by the agency; (3) comply with all visitation guidelines as arranged by the caseworker; (4) attend all court hearings, permanency conferences, and scheduled family visits; (5) complete parenting classes; (6) maintain stable employment or income benefits for six months; (7) acquire and maintain stable and safe housing; (8) complete a psycho-social assessment and follow all recommendations, including individual and family therapy; and (9) participate in a psychological evaluation and follow all recommendations from the service provider.

The record reflects a status hearing order signed by the trial court on August 7, 2018, in which the court found that (1) Mother had appeared in person and through her attorney at the hearing; (2) Mother's service plan is reasonable; (3) the goal of the service plan is to return Lori to Mother, and the plan adequately ensures

21

that reasonable efforts are being made to enable Mother to provide a safe environment for Lori; (4) the plan is reasonably tailored to address any specific issues identified by the Department; (5) Mother reviewed and understood the service plan, Mother has been advised that unless she is willing and able to provide Lori with "a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or to termination or [Lori] may not be returned to her;" and (6) Mother signed the plan. The trial court approved the service plan and made it an order of the court.

The record reflects that Ford created and filed a second service plan on September 10, 2018, which was identical to the first service plan except that it added to the list of tasks and services that Mother was required to complete a psychiatric evaluation and to "follow all recommendations which may include a medicine regiment, individual therapy, family therapy, and/or group therapy." This service plan was admitted into evidence at trial, and Ford testified that Mother had received and signed the second service plan. Ford testified that she discussed every item on the service plan with Mother. Ford could not "put a number on" how many times she discussed the plan with Mother, but stated that every time she spoke to Mother, she would "definitely go over the plan" with Mother. Ford stated that she spoke to Mother at least twice a month and also offered to meet with Mother every month.

Ford also offered Mother help to find stable and safe housing. For example, Ford offered Mother a place in a shelter at which she would "work programs" and then "have her own place," but Mother refused. Ford stated she was concerned that Mother failed to comply with the tasks, services, and goals set forth in the service plan she drafted for Mother. According to Ford, Mother failed to complete

22

family therapy and additional individual therapy as required by her service plan. Ford testified that she told Mother at a permanency hearing that Mother should complete additional therapy, and Mother acknowledged "that she was told from a psychiatrist but she was not going to do it."

By implementing a family service plan and reviewing the plan and the consequences of failure to comply with the plan, the Department met its burden regarding the first element. Thus, we conclude a reasonable factfinder could have formed a firm belief or conviction that the Department made reasonable efforts to return Lori to Mother. Accordingly, we overrule Mother's second issue.

## C. Predicate Finding under Section 161.001(b)(1)(O)

In her third issue, Mother contends that the evidence is legally and factually insufficient to support termination under section 161.001(b)(1)(O), which requires a factfinder to find by clear and convincing evidence that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

However, despite Mother's statement, she does not challenge the evidence supporting the trial court's predicate finding. Instead, Mother contends that a preponderance of the evidence demonstrates she was unable, through no fault of her own, to complete the service plan because of "a mental health disorder and an abusive home." That contention is an invocation of the statutory defense to termination under subsection O, codified in section 161.001(d). *See id.* § 161.001(d). The Texas Family Code establishes a single affirmative defense to

23

termination for failure to comply with a court order:

> A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
>> (1) the parent was unable to comply with specific provisions of the court order; and
>>
>> (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

*Id.* The record before us supports the trial court's conclusion in its final termination decree that Mother failed to raise a statutory defense to termination based on failure to comply with a court order, and "even if presented" it was not proven by a preponderance of the evidence.[6] Mother did not raise the defense in the trial court nor did she satisfy her burden of proof and establish the applicability of the defense. Section 161.001(d) places the burden on the parent to prove by a preponderance of the evidence that she was unable to comply with the court-ordered service plan, she made a good faith effort to comply with the order, and her failure to comply is not attributable to any fault of her own. *Id.*

Mother contends in her brief that (1) there is no evidence indicating that she "understood the service plan or that it was tailored to her mental health issues;" (2) "the court appointed an attorney to serve as Mother's guardian ad litem indicating that Mother lacked some mental capacity;" (3) she tried to comply with the service plan "to the extent that she could under the circumstances;" and (4) "Mother's mental health issues made completion of the services virtually impossible." But

---

[6] The Department argues that "Mother failed to preserve subsection (d) affirmative defense for this Court's review" because she did not plead the defense, and "[a]n affirmative defense must be pleaded." However, assuming without deciding that Mother did not waive the section 161.001(d) defense for failure to specifically plead it, we conclude she failed to meet her burden of proof.

Mother offered no evidence at trial that she was unable to comply with the specific provisions of the court order, that she made a good faith effort to comply with the order, and that her failure to comply with it is not attributable to her fault.

Mother did not explain (as she alleges now on appeal) why "mental health issues made completion of the services virtually impossible" when she was able to complete several of the tasks and services required by the service plan. Contrary to Mother's assertion that there is no evidence indicating that she understood the service plan or that it was tailored to her mental health issues, the trial court found in its order that Mother understood the service plan, the service plan was reasonable and accurate, and it was "reasonably tailored to address any specific issues identified by the Department." Mother does not challenge these findings nor does she point to evidence controverting them. Additionally, the service plan specifically provided for tasks and services to address concerns regarding Mother's mental health by requiring her to participate in and complete (1) a psychiatric evaluation and to "follow all recommendations which may include a medicine regiment, individual therapy, family therapy, and/or group therapy"; (2) individual therapy, and complete any recommended family or group therapy; (3) parenting classes; (4) a psycho-social assessment and follow all recommendations which may include a psychiatric evaluation, individual therapy, family therapy, and/or group therapy; and (5) a psychological evaluation and follow all recommendations from the service provider.

Therefore, we conclude that the trial court's findings that Mother failed to raise and prove the statutory defense are supported by legally and factually sufficient evidence in the record. Accordingly, we overrule Mother's third issue.

## III. Best Interest

In her fourth issue, Mother challenges the legal and factual sufficiency of the

25

evidence to support the trial court's finding that termination of the parent-child relationship was in the best interest of Lori. However, her brief contains no legal argument in support of this issue.

The Rules of Appellate Procedure require that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). An appellate issue that is unsupported by argument or contains an argument lacking citation to the record or legal authority presents nothing for review. *In re A.L.P.*, No. 01-19-00144-CV, 2019 WL 3949461, at *5 (Tex. App.—Houston [1st Dist.] Aug. 22, 2019, pet. dism'd) (mem. op.); *In re B.T.D.*, No. 01-16-00582-CV, 2017 WL 343613, at *7 (Tex. App.—Houston [1st Dist.] Jan. 20, 2017, no pet.) (mem. op.). "'Bare assertions of error without argument or authority waive error.'" *In re A.L.P.*, 2019 WL 3949461, at *5 (quoting *In re J.A.M.R.*, 303 S.W.3d 422, 425 (Tex. App.—Dallas 2010, no pet.); *see also In re K.C.B.*, 280 S.W.3d 888, 896 (Tex. App.—Amarillo 2009, pet. denied) (Mother waived challenge to sufficiency of evidence on best interest finding in parental termination case because of inadequate briefing).

Here, Mother neither provided any substantive analysis of the evidence regarding the child's best interest nor appropriate citations to the record to support her challenge to the trial court's best interest finding. Mother failed to demonstrate how the evidence in this case is insufficient to support the trial court's finding that termination of her parental rights was in Lori's best interest. Her conclusory and bare assertion that "[a]n evaluation of [the *Holley*[7]] factors in this case reveals the legal and factual insufficiency of the evidence to support the judgment" presents

---

[7] *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (listing factors to consider when determining the best interest of a child).

no legal argument.

Therefore, we conclude that Mother's alleged issue is waived as inadequately briefed. *See In re A.L.P.*, 2019 WL 3949461, at *5; *In re B.T.D.*, 2017 WL 343613, at *7-8 (parent waived challenge to legal and factual sufficiency of evidence supporting trial court's best interest finding because parent inadequately briefed it); *In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *14 n.17 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.) (same); *In re D.V.*, No. 06-16-00065-CV, 2017 WL 1018606, at *7 (Tex. App.—Texarkana Mar. 16, 2017, pet. denied) (mem. op.) (same); *In re D.J.W.*, 394 S.W.3d 210, 223 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (same). Accordingly, we overrule Mother's fourth issue.

## CONCLUSION

We reverse the Final Decree for Termination only as to the trial court's finding under section 161.001(b)(1)(D), and we render judgment deleting that finding. *See* Tex. R. App. P. 43.2(c). We affirm the decree in all other respects.


/s/     Meagan Hassan
                Justice


Panel consists of Justices Jewell, Zimmerer, and Hassan. (Jewell, J., concurring).